**NOTICE:** This order was filed under Illinois Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2026 IL App (3d) 230161-UB

Order filed April 24, 2026

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2026

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 21st Judicial Circuit, Kankakee County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-23-0161 Circuit No. 20-CF-469 |
| WILLIAM P. HEINTZ, | ) ) ) | Honorable Kathy S. Bradshaw-Elliott, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE DAVENPORT delivered the judgment of the court.
Presiding Justice Hettel and Justice Brennan concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:   (1) The court did not err by permitting defendant's ex-wife to testify, (2) any error in admitting testimony that defendant violated a firearms protective order was harmless, and (3) the final order of protection is modified to reflect the statutorily compliant expiration date of December 8, 2031.

¶ 2    Defendant, William P. Heintz, appeals from his convictions for aggravated domestic battery, unlawful restraint, and domestic battery. He argues the trial court erred by (1) failing to admit evidence of the victim's subsequent attacks on defendant, (2) permitting evidence of a previous battery against the victim but not evidence defendant was acquitted of that charge,

(3) allowing defendant's ex-wife to testify, (4) permitting other-crimes testimony that defendant violated a firearms protective order, and (5) entering a final order of protection (OP) that does not comply with the statute.

¶ 3     We initially vacated defendant's convictions and remanded to the trial court for further proceedings, finding that the court erred by barring evidence of altercations between defendant and the victim which postdated the charged offense, and precluding evidence defendant was acquitted of a previous battery. *People v. Heintz*, 2024 IL App (3d) 230161-U, ¶¶ 26, 34, 39. Subsequently, our supreme court reversed and remanded the judgment directing us to consider defendant's remaining claims. *People v. Heintz*, 2026 IL 131340, ¶ 56. We affirm as modified.

¶ 4                                    I. BACKGROUND

¶ 5     Defendant was charged with attempted first degree murder (720 ILCS 5/8-4(a), 9-1(a) (West 2020)), aggravated domestic battery (*id.* § 12-3.3(a-5)), unlawful restraint (*id.* § 10-3(a)), and domestic battery (*id.* § 12-3.2(a)(1)). The charges alleged that, on August 6, 2020, defendant stood on Brianne Szalaj's neck while running water over her face, strangled Szalaj, kept Szalaj from leaving the bathroom, and struck Szalaj about her body with his hands. Defendant claimed self-defense.

¶ 6     The State moved *in limine* to admit testimony of defendant's alleged previous domestic batteries. The court permitted evidence of four incidents, including a July 3, 2020, incident for which defendant was charged but later acquitted. Defendant moved *in limine* to introduce home surveillance videos of two incidents from November 5, 2020, and February 9, 2021, purporting to show Szalaj's violent character. Both videos were recorded on the same camera inside defendant's home. The footage from November 5, 2020, showed Szalaj yelling at defendant before she

2

splashed beer in his face, poured the rest of the beer on his head, and threw the empty can at his face.

¶ 7        The February 9, 2021, footage showed Szalaj strike defendant with her purse as he fell to the ground. Szalaj continued to strike defendant with her purse while he was on the ground. After a struggle, partially obscured by a chair in the foreground, Szalaj punched defendant twice in the head while he was still on the ground. Defendant then stood up and walked into another room. Szalaj began to follow defendant and appeared ready to punch him as they exited the camera's view. Out of view, defendant appeared to either push or hit Szalaj back. After they argued for a brief period, Szalaj ripped the camera down. The court denied the motion, believing conduct by the victim postdating the charged offenses was inadmissible under *People v. Evans*, 2018 IL App (4th) 160686, ¶¶ 30-34.

¶ 8        During opening arguments at the jury trial, defense counsel mentioned defendant was arrested and tried in Iroquois County for misdemeanor domestic battery. The court sustained the State's objection before defense counsel was able to state to the jury that defendant was acquitted of that charge.

¶ 9        Szalaj testified that on the night of August 5, 2020,[1] she arrived home to find defendant there, even though she did not expect to see him that night. Defendant had access to Szalaj's house because his vehicle was programmed to open her garage door. Defendant asked Szalaj for her cell phone, and she refused to give it to him. Defendant grabbed her face, ripping skin and causing bleeding. She ran into the bathroom, and defendant kicked down the door. Defendant threw Szalaj into the bathtub, stepped on her neck with his boot, and ran water over her face. Szalaj briefly

---

[1]While Szalaj initially indicated she came home the night of August 6, 2020, additional testimony indicates this was a misstatement, and the incident began on the night of August 5 and continued until the morning of August 6.

3

blacked out during the incident. Defendant punched her in the face while she was in the bathtub. Defendant pulled out a knife and threatened to kill her. He continued to run water over her face and held her head with his hand. Defendant flipped the knife open. Szalaj told defendant, "just get it over with," and put her hand up. Defendant cut her thumb. Szalaj testified the abuse in the bathroom continued for hours.

¶ 10    At approximately 3:30 a.m., Szalaj went to her bedroom, opened her window, and cried out for help. Defendant told Szalaj they could discuss what happened later, and they fell asleep at approximately 4 a.m. Szalaj awoke at approximately 7 a.m., and defendant was still there. She logged into her work computer and messaged a coworker to send the police to her home. When the police arrived, defendant was upstairs attempting to fix the bathroom door. Defendant fled. Photographs depicting Szalaj's injuries were introduced into evidence. Additional photographs were admitted into evidence showing the bathroom door, blood on Szalaj's pants, blood in the bathroom, and blood in the bathtub.

¶ 11    Six days later, Szalaj notified the police she found a knife under her bed. A photograph of the knife was admitted into evidence, as well as a photograph showing where it was discovered. Szalaj testified she did not touch the knife.

¶ 12    After August 6, 2020, Szalaj and defendant continued to have contact "off and on." Defendant primarily initiated the contact, though Szalaj initiated contact at times despite having an OP against defendant. Szalaj also stayed overnight at defendant's house. Defendant mostly contacted Szalaj when a trial date was approaching to say she needed to work with him on the trial.

¶ 13    Per the ruling *in limine*, Szalaj discussed the four prior incidents wherein defendant struck her in the head with a gun, stood over her while striking her multiple times about her body, broke her cell phone before screaming at her, and put his knees on her chest and face. On July 3, 2020,

4

defendant slammed her face into the ground after forcing her from his home. Outside the presence of the jury, defense counsel stated they intended to introduce evidence of defendant's previous acquittal related to the events of July 3, 2020, through cross-examination. The court prohibited the introduction of this evidence.

¶ 14　　A registered emergency room nurse testified she treated Szalaj on August 12, 2020. Szalaj told the nurse she was involved in a domestic dispute where she was grabbed by the lip and started bleeding. Szalaj reported losing consciousness. Szalaj informed the nurse the bathroom door was kicked down, and she was punched and kicked. The nurse noted bruising under Szalaj's eye.

¶ 15　　Jason Sztuba, an officer with the Bourbonnais Police Department, testified that on August 6, 2020, he was dispatched for a welfare check. When Sztuba arrived, Szalaj came running outside asking for help. She had a black eye. As Sztuba was talking with Szalaj, he heard the back door slam. Szalaj stated it was defendant running out the back door. Sztuba took photographs of Szalaj's injuries, which were admitted into evidence.

¶ 16　　Defendant was arrested on August 6, 2020, following a traffic stop. An officer observed red stains on the upper part of defendant's T-shirt and button-up shirt. Officers were unable to locate the knife at the time, but it was later recovered. A forensic scientist testified a bloodstain on the handle of the knife contained Szalaj and defendant's DNA. No blood was recovered from the blade of the knife.

¶ 17　　On August 7, 2020, Sztuba learned defendant failed to complete a firearms disposition in Iroquois County, which required defendant to surrender his firearm owner's identification card and disclose the make, model, and serial number of all firearms in his possession as well as the name and address of the person to whom the firearms would be transferred during the prohibited term. A search of defendant's residence was conducted pursuant to a firearms protective order. As

Sztuba began to explain what the order was, counsel objected as to relevance. A discussion was held off the record and the objection was overruled. Sztuba testified, "if a person felt that somebody was a danger and had firearms *** we would present that to the Judge for permission to search the residence for firearms." When searching defendant's residence, "a lot of firearm related material like magazines and ammunition" were discovered including a loaded Ruger pistol and three rifles.

¶ 18  Dawn Heintz, defendant's ex-wife, testified regarding instances of abuse starting in 2004. Dawn married defendant in 1994 before filing for divorce in 2004. Their divorce was finalized in 2007. Dawn testified that in 2004, defendant pushed her to the ground in their garage resulting in a cut to her hand which required stitches. Dawn received an OP against defendant. Following the incident, defendant moved out of the house and took the couple's dog. Dawn testified defendant regularly kept the dog in a plastic airline crate for 13 or more hours a day in a dark basement. When Dawn confronted defendant about the dog's condition, he stated he "didn't care." Between 2004 to 2007, defendant had called Dawn asking her to drop the OP and continually appeared at places shortly after Dawn arrived. In 2020, she filed another OP after receiving texts from "a Google number." She believed the messages were from defendant because they were similar to previous messages defendant had sent her. The State rested.

¶ 19  A friend of defendant testified that in February 2019, he saw Szalaj approach defendant from behind and "crack[ ] him in the back of the head." Defense counsel again raised the issue of introducing evidence of the not-guilty verdict from Iroquois County. The court maintained its earlier ruling.

¶ 20  Defendant testified he began a relationship with Szalaj in 2016. On the evening of August 5, 2020, he and Szalaj were still in a relationship and were planning to meet at her home. When defendant arrived there after midnight, Szalaj was sleeping, and he woke her. He questioned Szalaj

6

and asked to see her cell phone because her answers were evasive. Defendant testified he grabbed her cell phone, saw she had changed her password, and asked why. Szalaj then grabbed defendant's cell phone, threw a beer in his face, and fled to the bathroom with his phone. Defendant chased her, he used his body to "hit [the door] with some force," and the "doorjamb popped." After defendant forced the door open, Szalaj began to punch him and tried to knee him in the groin. He grabbed her arms to protect himself, and she fell into the bathtub during the struggle. He testified he pinned her in the bathtub with his boot. When he let her up, she began punching him again. They fell back into the bathtub, and he put his boot on her chest to restrain her until she calmed down. Defendant denied that he slapped, kneed, or kicked Szalaj or stepped on her neck. Szalaj eventually agreed to stop fighting, and they went to bed. Szalaj never opened the window to scream for help. When they awoke, defendant saw Szalaj had injuries. Defendant was injured as well but the police did not take photographs of his injuries. Defendant testified a photograph of Szalaj following this incident included old and new injuries, including from July 3.

¶ 21    Defendant denied battering Szalaj before the subject incident. As to the July 3, 2020, incident, he testified he was driving home when Szalaj slapped him. When they arrived at defendant's home, he ran inside and locked the door. Szalaj entered the home through the basement. They began to argue. As defendant attempted to walk away, Szalaj shoved him into a gun cabinet. Defendant attempted to physically remove Szalaj from his house. Szalaj continued fighting defendant before they tripped over a door threshold. The jury was not informed defendant was acquitted of charges stemming from this incident. Defendant further alleged Szalaj threw a beer can at his head in February 2019, struck him in the back of the head while he was talking to a bartender, and "sucker punched" him while he was driving in March 2019, resulting in a black eye.

7

¶ 22    The jury found defendant guilty of aggravated domestic battery, unlawful restraint, and domestic battery. It acquitted him of attempted first degree murder. Defendant filed a posttrial motion. Relevant to this appeal, defendant argued the court erred by precluding evidence of the incidents postdating the charged offenses and by denying the admission of defendant's previous acquittal. The court denied the motion.

¶ 23    Defendant's sentencing hearing was held on February 15, 2023. At the hearing, Szalaj and defendant testified. Defendant also gave a statement in allocution during which he stated, "[I]t's best to keep away from each other. Don't talk. So as far as order of protection and stuff like that, you don't have to worry about that. That's not going to be an issue." The State requested a final OP. The court stated, "I'm going to be signing a final criminal order of protection making sure you can never ever again have contact with [Szalaj]." The court signed a "Final Criminal Order of Protection," effective until February 15, 2032. Defendant was sentenced to three years' imprisonment, four years' mandatory supervised release (MSR), and received 69 days of presentence custody credit. Defendant filed a motion to reconsider sentence, which was denied.

¶ 24    On appeal, we initially found that the court committed reversible error by barring defendant from introducing evidence of instances of domestic violence that postdated the charged offense. *Heintz*, 2024 IL App (3d) 230161-U, ¶ 26. We further held that the court erred by barring defendant from introducing evidence that he was acquitted of charges stemming from the July 3 incident. *Id.* ¶ 34. We did not address defendant's remaining claims.

¶ 25    Thereafter, our supreme court found that it was not error to bar evidence of the incidents that postdated the charged offense. *Heintz*, 2026 IL 131340, ¶ 35. The court determined that the plain language of Illinois Rule of Evidence 405(b)(2) (eff. Jan. 1, 2011) "bars evidence of the victim's propensity for violence that occurred after the charged offense." *Id.* ¶ 33. Moreover, the

8

court found that any error in barring evidence of defendant's previous acquittal was harmless. *Id.* ¶ 54. Thus, the supreme court reversed and remanded, directing us to consider defendant's remaining claims. *Id.* ¶ 56.

¶ 26                                    II. ANALYSIS

¶ 27    Following the supreme court's ruling, we must determine defendant's remaining issues, including whether the trial court erred by (1) allowing defendant's ex-wife to testify, (2) permitting other-crimes testimony that defendant violated a firearms protective order, and (3) entering an OP that did not comply with the statute. We consider each argument in turn.

¶ 28                              A. Testimony of Dawn Heintz

¶ 29    We review the court's decision to admit or deny other-crimes evidence for an abuse of discretion. *People v. Donoho*, 204 Ill. 2d 159, 182-83 (2003). A trial court abuses its discretion when its ruling is "arbitrary, fanciful or unreasonable or where no reasonable man would take the view adopted by the trial court." (Internal quotation marks omitted.) *Id.* at 182. The abuse of discretion standard "is the most deferential standard of review—next to no review at all." *In re D.T.*, 212 Ill. 2d 347, 356 (2004).

¶ 30    Section 115-7.4(a) of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-7.4(a) (West 2022)), provides an exception to the common law rule barring other-crimes evidence where defendant is accused of an offense of "domestic violence as defined in paragraphs (1) and (3) of Section 103 of the Illinois Domestic Violence Act of 1986 [(750 ILCS 60/101 *et seq.* (West 2022)]." Under section 115-7.4(a) of the Code, evidence of "another offense or offenses of domestic violence is admissible, and may be considered for its bearing on any matter to which it is relevant" (*id.*), including defendant's propensity to commit acts of domestic violence. *People v. Currie*, 2022 IL App (4th) 210598, ¶ 74. The court may consider "(1) the proximity in time to the

9

charged or predicate offense; (2) the degree of factual similarity to the charged or predicate offense; or (3) other relevant facts and circumstances," when weighing the probative value of the evidence against the undue prejudice. 725 ILCS 5/115-7.4(b) (West 2022).

¶ 31 Defendant first argues evidence of the 2004 incident was inadmissible given the above factors. There is no bright-line rule regarding when a crime is too distant in time to be admitted. *Donoho*, 204 Ill. 2d at 183-84. Instead, the proximity in time must be evaluated on a case-by-case basis and is only one factor in determining the other crime's probative value. *Id.* at 183. Further, "[t]he existence of some differences between the prior offense and the current charge does not defeat admissibility because no two independent crimes are identical." *Id.* at 185. General areas of similarity may be sufficient to establish the admissibility of other-crimes evidence. *People v. Littleton*, 2014 IL App (1st) 121950, ¶ 36. Here, the 16-year gap is not a bar to Dawn's testimony. The charged and prior conduct share important similarities which weigh in favor of admission of the evidence. Both incidents involved acts of domestic violence against a woman with whom defendant was in a long-term relationship. Throughout both relationships, defendant committed escalating acts of violence. Defendant was alleged to have pushed or thrown both women to the ground. It was not an abuse of discretion to allow evidence of the 2004 incident.

¶ 32 Defendant also argues the scope of Dawn's testimony exceeded the bounds of section 115-7.4 of the Code because she testified to other acts that were not "another offense or offenses of domestic violence." The statute defines "[d]omestic violence" as "abuse." 750 ILCS 60/103(3) (West 2022). "Abuse," in turn, is defined as "physical abuse, harassment, intimidation of a dependent, interference with personal liberty or willful deprivation." *Id.* § 103(1). "Harassment" is "knowing conduct which is not necessary to accomplish a purpose that is reasonable under the circumstances; would cause a reasonable person emotional distress; and does cause emotional

10

distress to the [victim]." *Id.* § 103(7). Dawn testified defendant would show up places shortly after she arrived, kept the dog in unsatisfactory conditions, and contacted her to threaten and harass her following the entry of an OP. These acts of harassment are contemplated and covered by the statute and the court did not err by permitting this testimony. Moreover, even accepting defendant's argument, any error regarding the admission of Dawn's testimony was harmless. See *People v. Smart*, 2025 IL 130127, ¶ 90. An evidentiary error is harmless if (1) the evidence overwhelmingly supports the conviction, (2) there is no reasonable probability the error contributed to the verdict, or (3) the error concerns evidence which is only cumulative of other evidence properly presented at trial. *People v. Sanders*, 2021 IL App (5th) 180339, ¶ 67. Any error in admitting Dawn's testimony was harmless where there is no reasonable probability the jury would have acquitted defendant had the evidence been excluded.

¶ 33                                              B. Firearms Protective Order

¶ 34        Next, defendant argues the trial court erred by permitting irrelevant and prejudicial other-crimes testimony that defendant violated a firearms protective order. Defendant acknowledges he did not preserve the issue for review because he failed to raise it in his posttrial motion. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Defendant does not argue that any exception to the forfeiture rule applies. Defendant instead urges us to review the matter because the court "had the error brought to its attention and had the opportunity to rule. That, combined with the fact that there is no justification for why the subsequent search and discovery of firearms is relevant to this prosecution, is a valid basis for addressing the issue." Defendant does not provide any case law to support this proposition. Therefore, we decline to review the forfeited issue. See *People v. Holmes*, 2016 IL App (1st) 132357, ¶ 65.

¶ 35                                              C. Order of Protection

11

¶ 36    Defendant next argues the court erred regarding the OP. The State argues that defendant forfeited this issue because he did not raise the issue in his posttrial motion. Defendant responds that a final OP is "governed by the rules of civil procedure of this State." 725 ILCS 5/112A-6.1(a) (West 2022). Pursuant to Illinois Supreme Court Rule 303(a)(1) (eff. July 1, 2017), "notice of appeal must be filed *** within 30 days after the entry of the final judgment appealed from, or, if a timely posttrial motion directed against the judgment is filed, *** within 30 days after the entry of the order disposing of the last pending postjudgment motion." Defendant was therefore not required to raise the issue in a posttrial motion. See *In re Marriage of Wright*, 212 Ill. App. 3d 392, 398 (1991). Defendant's notice of appeal was filed within 30 days of the entry of the order disposing of the last pending posttrial motion, and, accordingly, we will address this issue.

¶ 37    Defendant first argues that the court exceeded its authority in its statement that defendant would "never ever again have contact with [Szalaj]." For a domestic violence OP, the duration is limited to "2 years after the date set by the court for expiration of any sentence of imprisonment and subsequent parole, aftercare release, or [MSR]." 725 ILCS 5/112A-20(b)(4) (West 2022). While a perpetual bar in contact would run afoul of the statute, when viewed in context, it is clear the court's statement was not meant as a literal order, but instead, merely reflected the court's hope that its subsequent written order would prevent any future contact between defendant and Szalaj. This is especially clear when considered with defendant's own statement that it was "best [if they] keep away from each other" and "[d]on't talk."

¶ 38    The signed order in this matter states it is effective until February 15, 2032. Defendant argues the order does not comply with the statute because the expiration date does not account for defendant's 69 days of presentence custody credit. The State agrees. Defendant's sentence, including the four-year MSR period, will be completed on December 8, 2029. Two years after the

12

expiration of this sentence would be December 8, 2031, and, therefore, the current expiration date of February 15, 2032, does not comply with the requirements of the statute. Despite the expiration date which exceeds the bounds of the statute, the court's statements and order reflect its desire to set the latest possible expiration date for the OP. We therefore modify the order to accurately reflect the statutorily compliant expiration date of December 8, 2031. See Ill. S. Ct. R. 366(a)(1) (eff. Feb. 1, 1994).

¶ 39     Defendant finally argues the court did not afford him an opportunity to be heard on the remedies requested in the order as required by statute. We disagree. Szalaj and defendant testified at the sentencing hearing. Defendant gave a statement in allocution. Defendant acknowledged he would comply with the terms of an OP and indicated he would not have any further contact with Szalaj. If defendant desired any additional opportunity to be heard concerning the OP, he could have objected to its entry at the sentencing hearing or raised the issue in his motion to reconsider. Defendant cites no authority to support his claim that the opportunity afforded to him was insufficient and does not demonstrate what additional process was due. See *People v. Carter*, 377 Ill. App. 3d 91, 104 (2007). Defendant has therefore failed to establish the court did not provide him a sufficient opportunity to be heard.

¶ 40                                III. CONCLUSION

¶ 41     For the reasons stated, we affirm the judgment of the circuit court of Kankakee County and modify the final OP's expiration date to reflect the statutorily compliant date of December 8, 2031.

¶ 42     Affirmed as modified.